1  **LAW OFFICES OF DALE K. GALIPO**
2  Dale K. Galipo (SBN 144074)
   dalekgalipo@yahoo.com
3  Cooper Alison-Mayne (SBN 343169)
   cmayne@galipolaw.com
4  21800 Burbank Boulevard, Suite 310
   Woodland Hills, CA 91367
5  Phone: (818) 347-3333

6  *Attorneys for Plaintiff*

7

8                 UNITED STATES DISTRICT COURT

9               CENTRAL DISTRICT OF CALIFORNIA

10

11  MARIA SALAZAR,                    Case No.: 2:24-CV-07692-DMG-JC
                                      Judge Gee
12               Plaintiff,
                                      **DECLARATION OF COOPER**
13       vs.                          **ALISON-MAYNE IN SUPPORT OF**
                                      **PLAINTIFF'S OPPOSITION TO**
14  CITY OF TORRANCE; RYAN            **DEFENDANTS' MOTION FOR**
    CADIZ; JOHN ESCARENO JR.,         **SUMMARY JUDGMENT**
15
                 Defendants.
16

17

18

19

20

21

22

23

24

25

26

27

28



1

## **DECLARATION OF COOPER ALISON-MAYNE**

I, Cooper Alison-Mayne, hereby declare as follows:

I am an attorney duly licensed to practice law in the State of California and the United States District Court for the Central District of California. I am one of the attorneys of record for the Plaintiffs. I make this declaration in support of Plaintiffs' Opposition to Defendants' Motion for Summary Judgement. I have personal knowledge of the facts contained herein and could testify competently thereto if called.

To be lodged separately as **"Exhibit A"** is a true and correct copy of the relevant portion of the video of the incident produced by Defendants City of Torrance and Ryan Cadiz during discovery, which is the same video submitted by Defendants as Exhibit 1 to ECF 46, excerpted to include only the footage most relevant to the matters at issue.

Attached hereto as **"Exhibit B"** is a true and correct copy of excerpts from the Deposition of Ryan Cadiz, taken on December 16, 2024;

Attached hereto as **"Exhibit C"** is a true and correct copy of Ryan Cadiz Supplemental Report produced by Defendants as City of Torrance and Ryan Cadiz during discovery;

Attached hereto as **"Exhibit D"** is a true and correct copy of Screenshots from Body Worn Camera produced by Defendants as City of Torrance and Ryan Cadiz during discovery;

Attached hereto as **"Exhibit E"** is a true and correct copy of Screenshots from Exhibit 1, to ECF 46, produced by Defendants as City of Torrance and Ryan Cadiz;

Attached hereto as **"Exhibit F"** is a true and correct copy of  Screenshot from Motorcycle Officer Camera, produced from Defendants as City of Torrance and Ryan Cadiz during discovery;

Attached hereto as **"Exhibit G"** is a true and correct copy of Screenshots from Body Worn Camera, produced from Defendants as City of Torrance and Ryan Cadiz during discovery;

Attached hereto as **"Exhibit H"** is a true and correct copy of Screenshots Officer Body Worn Camera, which was produced from Defendants as City of Torrance and Ryan Cadiz during discovery;

Attached hereto as **"Exhibit J"** is a true and correct copy of Screenshots from Exhibit A;

Attached hereto as **"Exhibit K"** is a true and correct copy of excerpts from the Deposition of Michael Guell, taken on on September 24, 2025.


I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.  Executed on this 15th day of January 2026.


Dated: January 16, 2026          **LAW OFFICES OF DALE K. GALIPO**

By:    */s/    Cooper Alison-Mayne*
          Dale K. Galipo
          Cooper Alison-Mayne
          *Attorneys for Plaintiff*

# EXHIBIT B

1                    UNITED STATES DISTRICT COURT

2                    CENTRAL DISTRICT OF CALIFORNIA

3

4    MARIA SALAZAR,                      )
                                         )
5                 Plaintiff,             )
                                         )
6                 vs.                    )Case No.
                                         )2:24-CV-07692-DMG-JC
7    CITY OF TORRANCE; RYAN CADIZ; JOHN  )
     ESCARENO, JR.,                      )
8                                        )
                  Defendants.            )
9    _____)

10

11

12

13

14              REMOTE VIDEOCONFERENCE DEPOSITION OF

15                         RYAN CADIZ

16                  MONDAY, DECEMBER 16, 2024

17

18

19

20

21

22

23   Reported Stenographically By:

24   Jinna Grace Kim, CSR No. 14151

25   Job No.:  120382

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

Page 12

```
 1    you're asking.

 2    BY MR. GALIPO:

 3         Q.   For example, did you know if there were traffic

 4    controls at that intersection?

 5         A.   No.  I've never paid attention to it.

 6         Q.   Did you know if there were marked crosswalks at that

 7    intersection?

 8         A.   Yes.

 9         Q.   And what did you know in that regards?

10         A.   That there were marked crosswalks at the

11    intersection.

12         Q.   Do you know now whether there's traffic controls at

13    the intersection?

14         A.   No.

15         Q.   Do you know now that the individual that was struck

16    was in a marked crosswalk?

17              MR. AUSTIN:  Objection.  Lack of foundation; calls

18    for speculation.

19              Answer to the extent you know.

20              THE WITNESS:  Can you repeat the question, please.

21    BY MR. GALIPO:

22         Q.   Yes.  Do you know now from reviewing the videos that

23    the individual you struck was in a marked crosswalk?

24              MR. AUSTIN:  Objection.  Vague as to videos.

25    BY MR. GALIPO:
```

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

Page 15

1    Anytime that would have been practicable during the

2    whole pursuit.

3    Q.   Right.  But at some point did you decide you were

4    going to actually do a PIT maneuver?

5    A.   Yes.

6    Q.   And when did you first decide that?

7         MR. AUSTIN:  I think he means at what point did you

8    make the decision to --

9         (Simultaneous conversation.)

10        THE WITNESS:  --

11        MR. AUSTIN:  Yeah --

12        THE WITNESS:  The part I decided that is when the

13   suspect drove up onto the sidewalk towards a crowded gas

14   station, threw out the light pole and drove back into

15   traffic.  While he was leaving at slow speed and under our

16   threshold per our PIT pursuit policy, I decided to make that

17   vehicle PIT.

18   BY MR. GALIPO:

19        Q.   And how much time passed from your decision to do

20   the PIT maneuver to the time of actual contact?

21        MR. AUSTIN:  Hold on.  I think -- I think there is

22   some confusion here.

23        I think he's asking you at what time did you decide

24   to execute --

25        (Simultaneous conversation.)

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

Page 16

1          THE WITNESS:  --

2          MR. AUSTIN:  -- at the time --

3          (Simultaneous conversation.)

4          COURT REPORTER:  Excuse me, excuse.  I can't

5    understand the banter between you two guys.  So if you guys

6    want this conversation on the record, you have to speak

7    clearly so that I can understand you guys.

8          I can't understand your conversation.

9          MR. AUSTIN:  We are practically shouting in this

10   room.  I apologize.  That's what happens when we schedule a

11   Zoom deposition.  We are doing our best to be heard.

12          Okay?

13          MR. GALIPO:  Okay.  We can hear you better now.

14          COURT REPORTER:  Please be aware.

15          MR. GALIPO:  I think it's just that you might be a

16   little bit of a distance from the microphone, but thank you

17   for keeping your voice up.

18          MR. AUSTIN:  Officer Cadiz, I think what he is

19   trying to get at is when you decided to specifically execute

20   on this PIT maneuver, not when you decided he was worthy of

21   having a PIT maneuver executed, but when did you decide to

22   execute on this one.

23          THE WITNESS:  When I decided to exactly execute the

24   PIT maneuver was when I reached the intersection of Sepulveda

25   and Vermont.

MARIA SALAZAR vs CITY OF TORRANCE, ET AL
Ryan Cadiz on 12/16/2024

Page 17

1    BY MR. GALIPO:

2        Q.    And when you decided to do it, as your counsel

3    clarified, how much time passed from you deciding to actually

4    execute it and the time of contact?

5        A.    I would estimate two to three seconds.

6        Q.    And what would you estimate the speed of your

7    vehicle when you decided to execute the PIT maneuver?

8        A.    Watching the video, it shows 32 miles-per-hour.

9        Q.    And what would you estimate the speed of the vehicle

10   you were attempting to do the PIT maneuver on when you

11   decided to execute it?

12       A.    Approximately two to five miles-per-hour.

13       Q.    What part of the vehicle were you intending to

14   strike?

15       A.    Rear driver side, quarter panel.

16       Q.    And what part of your vehicle were you intending to

17   strike it with?

18       A.    With my front passenger side fender and bumper.

19       Q.    What would you estimate the distance to be between

20   your vehicle and the vehicle you were pursuing when you

21   decided to execute the PIT maneuver?

22       A.    Approximately 10 to 15 feet.

23       Q.    Did you have to close that distance in order to make

24   contact?

25       A.    Yes.

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

Page 18

1    Q.   Did you accelerate your vehicle at all after you

2    decided to execute the PIT maneuver?

3    A.   Yes.

4    Q.   And to what speed do you think you accelerated to?

5    A.   Approximate speed was 32 miles-per-hour.

6    Q.   Do you have an estimate as to what speed your

7    vehicle was going prior to the acceleration?

8    A.   I would estimate approximately five to ten

9    miles-an-hour.

10    Q.   And you're saying you observed this head in the

11    intersection; was it about a second before impact?

12    A.   I would say yes.

13    Q.   Had you ever done a PIT maneuver before?

14    A.   Yes.

15    Q.   On how many prior occasions?

16    A.   Various times in training and one time prior to in

17    the field.

18    Q.   And did you have training on the PIT maneuver in the

19    academy?

20    A.   I have had training on the PIT maneuver in the

21    academy with a LAPD and in the pre-academy with Torrance PD,

22    and every two years at each agency for refreshing our pursuit

23    policy and PIT policy with the yearly driver course.

24    Q.   And were you trained there when doing the PIT

25    maneuver, you have to be careful not to have your vehicle or

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

Page 30

1  how far would you estimate you were from the vehicle you were

2  trying to impact?

3      A.    Probably a halfway point.  So if I'm saying maybe 25

4  feet, maybe 12 to 14 feet.

5      Q.    And is that about the time you saw the pedestrian?

6          MR. AUSTIN:  Only to the extent you know.

7          Only if you specifically recall.

8          THE WITNESS:  Yeah.  I wouldn't think so.

9          I don't know.  I can't really remember the exact

10  point.

11  BY MR. GALIPO:

12      Q.    Well, you do recall seeing the pedestrian at some

13  point before the impact?

14      A.    Yes.

15      Q.    And you're estimating that was about a second or so

16  before the impact?

17      A.    Yes.  I would assume so, yes.

18      Q.    Did you go to your brake before or after saw the

19  pedestrian?

20      A.    After I saw the pedestrian.

21      Q.    Would it be fair to say you saw the pedestrian at

22  some point before you braked?

23      A.    Yes.

24      Q.    Did you look for any pedestrians in the marked

25  crosswalk at that intersection before you started

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

Page 31

1  accelerating?

2      A.   Yes.

3      Q.   And what did you do to look?

4      A.   I looked ahead of myself in the area of where I was

5  conducting the PIT, and I didn't see anyone.

6      Q.   And why were you looking in the marked crosswalks at

7  the intersection before you accelerated?

8      A.   Because I would not PIT a vehicle if there were

9  pedestrians in the crosswalk.

10      Q.   And why not?

11      A.   The danger to pedestrian.

12      Q.   What danger are you referring to?

13      A.   Even though a PIT is a controlled maneuver, the car

14  to spin out, it doesn't mean that if someone's standing

15  there, there is no chance of them not getting hurt.

16          So I checked the crosswalk, and I didn't see anyone,

17  so I conducted the PIT maneuver.

18      Q.   If you would have seen someone in the crosswalk, are

19  you saying you would not have conducted the PIT maneuver at

20  that location at that time?

21          MR. AUSTIN:  Objection.  I'm not going to allow him

22  to answer that question.

23          MR. GALIPO:  And what's the basis of the objection?

24          MR. AUSTIN:  It's irrelevant policy issue.  The City

25  has a policy in place.  We can meet and confer over that

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

Page 39

```
 1   want to make sure I'm understanding.
 2            Can you tell me where you're getting the 32
 3   miles-an-hour?  It sounds like from reviewing one of the
 4   videos.
 5       A.   Yes.  On the video of the -- from the car, the
 6   in-car video that shows out.  When you watch it, it has an
 7   overlay that show when I brake and it shows the
 8   miles-per-hour on there throughout the whole pursuit.
 9       Q.   And how fast do you believe the vehicle was going
10   when you first applied the brakes?
11            MR. AUSTIN:  His vehicle?
12            MR. GALIPO:  Yes.  Thank you.
13            THE WITNESS:  Between 25 to 32 miles-an-hour.
14   BY MR. GALIPO:
15       Q.   And what would you estimate the speed of your
16   vehicle at the time of impact?
17       A.   Approximately 10 to 12 miles-an-hour.
18       Q.   Was there any problem, to your knowledge, with the
19   braking system on your vehicle?
20       A.   At that time I knew I had brake because I wasn't
21   able -- previously to the PIT I wasn't able to come to a
22   complete slowdown, that I was trying to slow down to avoid
23   bumming the suspect's vehicle.
24            So I knew the brakes were already shot from the
25   pursuit up to that point.
```

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

Page 52

```
 1        Q.   You were looking on Instagram just after the
 2   incident?
 3             MR. AUSTIN:  A few knew days later, Counsel.
 4             MR. GALIPO:  A few days.  Okay.
 5             I thought you said a few minutes.
 6             Okay.  That's fine.
 7   BY MR. GALIPO:
 8        Q.   So you struck the vehicle in the rear prior to
 9   reaching the intersection?
10        A.   Yes.
11        Q.   And what was your purpose in doing that?
12        A.   That was not on purpose.  That was due to my brakes
13   already having gone out.  I tried to stop before colliding
14   with him at that point, and I was not able to stop --
15             MR. AUSTIN:  --
16             (Simultaneous conversation.)
17             THE WITNESS:  Oh, yeah.  Then he also pulled in
18   front of me from the wrong side of the road back to the main
19   road.  So I didn't have any enough time to come to slow down.
20             MR. AUSTIN:  Counsel, I assume -- he's describing
21   the impact that was well before the PIT maneuver.
22             I assume you understand that; right?
23             MR. GALIPO:  Yes, I do.
24   BY MR. GALIPO:
25        Q.   So what street were you traveling on at the time of
```

MARIA SALAZAR vs CITY OF TORRANCE, ET AL
Ryan Cadiz on 12/16/2024

Page 59

1      Q.   So if I talk about whether something happened in the

2  intersection, will you keep in mind I'm meaning within that

3  box?

4      A.   Yes.

5      Q.   When you said earlier you looked in the marked

6  crosswalk to see if there were pedestrians, was that before

7  you entered the intersection or after?

8           MR. AUSTIN:  Counsel, just for clarify, this box of

9  the intersection, does it stop at the interlines within the

10  interlines of the crosswalk or the outer lines of the

11  crosswalk?

12          MR. GALIPO:  For purposes of this decision, we'll

13  say the interlines.

14          MR. AUSTIN:  So the inside box.

15          THE WITNESS:  Yes.  Can you ask your question again,

16  sir?

17  BY MR. GALIPO:

18      Q.   I'll try to remember it.

19          When you looked in the crosswalk as you described to

20  see if there were any pedestrians, was that before or after

21  you entered the intersection as we've defined it?

22      A.   That was before.

23      Q.   And were you looking at all in that marked crosswalk

24  area after you entered the intersection?

25      A.   Yes.

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

Page 60

1    Q.   So both before and after?

2    A.   Yes.

3    Q.   And when you first saw the head of this person as

4    you described, were you in the intersection, or was this

5    before you entered?

6    A.   I was already in the intersection.

7    Q.   You told me the approximate speed of the suspect

8    vehicle at the time of the first impact, I think, you said 40

9    to 45, approximately?

10   A.   I think so, yes.

11   Q.   And then did you observe the vehicle after going on

12   the sidewalk and coming back down into the street approaching

13   the intersection slowed down significantly?

14   A.   Yes.

15   Q.   And are you saying it slowed down to two to five

16   miles-an-hour?

17   A.   Approximately.

18   Q.   And when you saw it slow down, did you see the door

19   open?

20   A.   At that time I don't think I did.

21        I don't remember the door opening.

22   Q.   Is that sometimes, based on your experience, when

23   the vehicle slows down and the door starts to open, possible

24   indication that the person may be wanting to get out and flee

25   on foot?

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

Page 81

1    A.   On the sidewalk.

2    Q.   When you came back into the street, did you look in

3    that area again before entering the intersection, meaning the

4    marked crosswalk area?

5    A.   I was looking at the marked crosswalk the entire

6    time from what I got up to the curb and was following that

7    car to the intersection.

8    Q.   And you think when you were on the curb, you were

9    going 10 to 15 miles-an-hour?

10   A.   To the best of my knowledge, yes.

11   Q.   And then at some point you accelerated to 32?

12   A.   Yes.

13   Q.   I'm going to show you a video of the PIT maneuver.

14        We'll mark it as Exhibit 1.

15        (Exhibit 1 was marked for identification.)

16   BY MR. GALIPO:

17   Q.   And we're going to try to play it and you can tell

18   me if this is one of the videos you have seen.

19        MS. LEAP:  It's just opening up.

20        (Video playing.)

21        (Video paused.)

22        MR. GALIPO:  And we stopped it at -- I can't see the

23   time.

24        Can you see that, Shannon?

25        MS. LEAP:  On the video footage it's 50 minutes and

**MARIA SALAZAR vs CITY OF TORRANCE, ET AL**
**Ryan Cadiz on 12/16/2024**

```
 1                         CERTIFICATE

 2                             OF

 3            CERTIFIED STENOGRAPHIC SHORTHAND REPORTER

 4

 5            I, JINNA GRACE KIM, CSR No. 14151, a Certified

 6   Stenographic Shorthand Reporter of the State of California,

 7   do hereby certify:

 8            That the foregoing proceedings were taken before me

 9   at the time and place herein set forth;

10            That any witnesses in the foregoing proceedings,

11   prior to testifying, were placed under oath;

12            That a verbatim record of the proceedings was made

13   by me, using machine shorthand, which was thereafter

14   transcribed under my direction;

15            Further, that the foregoing is an accurate

16   transcription thereof.

17            I further certify that I am neither financially

18   interested in the action, nor a relative or employee of any

19   attorney of any of the parties.

20

21            IN WITNESS WHEREOF, I have subscribed my name, this

22   date:  December 16, 2024.

23                         _____

24                         Jinna Grace Kim, CSR No. 14151

25
```

# EXHIBIT C

## Supplement

TORRANCE POLICE DEPARTMENT
SUPPLEMENTAL REPORT

SUSPECT: Escareno, John DOB: 02/27/1989

DETAILS:

On 01/11/24, I *(Officer Cadiz) was working a special detail assigned to 9Z1 at the Del Amo Fashion Center. I was conducting extra patrol in the area of Carson Street and Del Amo Circle when LASD Air 7 advised that LASD units were in pursuit of a vehicle taken in a car jacking from the Walmart at 190th Street and Normandie Avenue.

Air 7 advised that the suspect's car had pulled into the parking structure off of Carson Street and Del Amo Circle East. I began to canvass the area for the suspect, when the carjacked vehicle was located unoccupied by 9Z3 (Officer Lopez). I began to canvass the area of the mall for the suspect and received a radio communication stating that the same suspect car jacked another vehicle( 2016 Toyota Prius License No. ███████ ).

I began to drive southbound on Del Amo Circle approaching Carson Street and observed the carjacked vehicle (Toyota Prius)` driving eastbound in the number 4 lane of Carson Street stopped at a red light headed eastbound. Fearing that another dangerous pursuit may be started by the suspect, ( based on the fact that he had just been in an extended pursuit with LASD) I attempted to safely block in the suspect vehicle with my patrol vehicle, but he drove around me on my passenger side and continued eastbound on Carson Street.

9M2 was behind me and followed the vehicle eastbound on Carson Street and initiated a pursuit. I continued eastbound on Carson Street and joined the pursuit and began to broadcast our location. The pursuit continued eastbound Carson Street until Crenshaw Boulevard where we continued southbound, until we turned eastbound on Sepulveda Boulevard.

I continued as secondary in the pursuit until we reached Sepulveda Boulevard and Cabrillo Avenue. 9M2 who was the primary in the pursuit then relinquished primary responsibility of the pursuit, and I took over as the primary unit. I continued eastbound on Sepulveda Boulevard behind the suspect who was driving speeds of approximately 90 miles per hour in light traffic. He then began to slow down when we approached Western Avenue due to cars blocking all the lanes of the intersection. The suspect then entered/continued the wrong way in the westbound lanes of Sepulveda Boulevard and continued Eastbound through a red light at Western Avenue in violation of 21453 (A) CVC. I cleared the intersection at Western Avenue and continued eastbound on Sepulveda Boulevard. I continued to follow the suspect down the center lane until we reached the intersection at Sepulveda Boulevard and Normandie Avenue.

We approached a green light at the intersection and the suspect vehicle entered/continued the wrong way in the westbound Sepulveda Boulevard lanes continuing eastbound narrowly avoiding oncoming vehicles. I paralleled the suspect who continued traveling at approximately 80 miles per hour in opposing lanes. The suspect continued to flee at a high rate of speed.

We continued eastbound on Sepulveda Boulevard approaching multiple vehicles and slowed down at the red light at the intersection of Vermont Avenue and Sepulveda

TORRANCE000096

Boulevard. As we passed Broadwell Avenue, The suspect unexpectedly merged back into the flow of traffic in front me, as I attempted to slow down I felt my brakes fade and I nudged the rear of his vehicle pushing him slightly forward. After our minor collision the surrounding vehicles slowed down and moved out of the way allowing the suspect to cut across all lanes of traffic and he drove up onto the south curb of Sepulveda Boulevard. The suspect continued eastbound colliding with a light pole and returning back into the number 4 lane of eastbound Sepulveda Boulevard.

I followed the suspect vehicle eastbound through a green light at Sepulveda Boulevard and Vermont Avenue. The suspect vehicle had significantly slowed down, and almost stopped, as if he was confused on which direction to go in the intersection. Knowing how dangerous this pursuit could be if he was allowed to regain his speed and knowing we were below the the 35 mile per hour threshold, I performed a PIT Maneuver and aimed my vehicle for the suspect vehicle's rear driver side quarter panel. As I closed the short distance with his vehicle, I glimpsed a pedestrain at the last minute walking eastbound through the crosswalk. I attempted to disengage from my intended PIT by braking as hard as I could and turning out of the way, but with the brake fade and last minute observation of the pedestrian, I was unable to completely avoid contacting the suspect's vehicle. The suspect's vehicle then spun and its rear quarter panel contacted the pedestrian, later ID'ed as IP/Salazar.

After the vehicles came to a stop, Carjacking Suspect/Escareno fled on foot southbound on Vermont Avenue and then eastbound through the Starbucks parking lot. Myself and 9Z3 (Officer Lopez) gave chase, while 9M2 checked on IP/Salazar. We continued in foot pursuit eastbound through the parking lot into the Carl's Jr. at (840 Sepulveda Boulevard). Once inside the restaurant the suspect surrendered by laying down on the ground and putting his hands behind his back. He was taken into custody without incident.

Upon an inventory search of the carjacked vehicle, I recovered a black screwdriver from the front floorboard of the driver side of the vehicle, which was determined to belong to the suspect. The screwdriver was booked into TPD Property as evidence. It should also be noted that while being taken into custody I discovered a the key to a Nissan in his front hoodie pocket. The key most likely belongs to the carjacked Nissan Altima which was abandoned by the suspect at the Del Amo Mall. I booked the key into TPD Property as evidence.

During the pursuit Suspect/Escareno committed multiple traffic violations, including running red lights and driving above the speed limit in opposing lanes of traffic. Due to Suspect/Escareno's actions, we respectfully request the filling of an additional charge for 2800.4 PC - Evading a Police Officer (F).

Custody of Suspect/Escareno was relinquished to LASD, who transported him to be booked for the stolen vehicle and car jacking not committed in the City of Torrance.

While I was in pursuit, I constantly took into consideration the suspects driving behavior, the safety of the general and motoring public, and the seriousness of the crimes the suspect had committed. It should also be noted; I did my best to drive with due regard for public safety, while also attempting to apprehend Escareno. Based on the knowledge I had of the suspect's previous crimes prior to the beginning of this pursuit I believed that he was a substantial public safety risk and a danger to the surrounding public area.

TORRANCE000097

It should also be noted that during the pursuit I was wearing my seat belt, and had my forward facing lights and sirens engaged. In addition, during the pursuit, my sirens did malfunction and shut off temporarily on a few occasions, but I was able to turn them back on, and they continued to properly function.

After inspecting my vehicle at the scene of the termination, I observed that I had a flat front passenger-side tire, I was unsure when it had occurred during the pursuit. After reviewing my external car video of the pursuit, I heard after my first collision with the suspect, there was a loud popping sound which I believed to be my vehicle's front passenger side tire blowing out. Due to my tire blowing out, when I attempted to disengage the pit, the flat tire caused my brakes and steering not to function properly.

After the suspect was in custody, I returned to where the pursuit terminated and met with IP/Salazar. IP/Salazar stated that she did not see or remember what happened. She stated that she knew she had been knocked to the ground. When I asked if IP/Salazar if she had any injuries, she stated that she was okay and just wanted to continue on her way. I had IP/Salazar stay at the scene until she was cleared by LA County Fire.

Reference other attached Crime and Supplemental Reports .

Cadiz #22438

SUPERVISOR APPROVING: Sgt. Stiller #16180

TORRANCE000098

# EXHIBIT D





# EXHIBIT E





# EXHIBIT F



# EXHIBIT G





# EXHIBIT H





# EXHIBIT J





# EXHIBIT K

1                UNITED STATES DISTRICT COURT

2                CENTRAL DISTRICT OF CALIFORNIA

3                        --oOo--

4

5    MARIA SALAZAR,

6            Plaintiff,

7    vs.                    Case No. 2:24-cv-07692-DMG-JC

8    CITY OF TORRANCE, RYAN
     CADIZ, AND JOHN ESCARENO
9    JR.,

10           Defendants.
     _____/

11

12

13        STENOGRAPHIC REPORTER'S TRANSCRIPT OF

14      REMOTE VIDEO DEPOSITION OF MICHAEL GUELL

15         WEDNESDAY, SEPTEMBER 24, 2025

16

17

18

19

20

21   Reported Stenographically by:

22   KIMBERLY D'URSO, CSR 11372, RPR

23   Job No.  19183

24

25

```
 1              THE VIDEOGRAPHER:  Going off the record at
 2    10:49 a.m.
 3              (Break taken.)
 4              THE VIDEOGRAPHER:  We're back on record at
 5    10:56 a.m.
 6    BY MR. ALISON-MAYNE:
 7         Q.   We talked about the upper range of the training
 8     for PIT maneuver, that the car would be going 35 miles
 9     an hour -- the PIT'd car would be going 35 miles an
10     hour.  Is there a lower range; like, where does the
11     training start?
12              MR. AUSTIN:  Objection.  Vague and ambiguous.
13              Are you talking about just what is utilized
14    during the field training scenarios, Counsel?  Because
15    that's when this issue came up.
16              MR. ALISON-MAYNE:  Yes.
17              MR. AUSTIN:  Okay.
18              THE WITNESS:  With regards to the lower limit,
19    we usually will start the students around 15 to 20 miles
20    an hour.  We do run into a lower-limit issue with being
21    able to conduct the PIT when it's too slow.
22    BY MR. ALISON-MAYNE:
23         Q.   So just to be clear, you were saying the
24     training involves eight to ten practice PIT maneuvers,
25     usually.  And am I understanding it right, that you
```

1   and ambiguous.  You mean they successfully stopped the

2   car?  Because the factors considered in, you know,

3   executing a PIT maneuver policy overall, are different

4   than the factors one considers as to whether or not I

5   will successfully stop this car.

6          MR. ALISON-MAYNE:  That's why I said

7   "successfully stopped the car."

8          MR. AUSTIN:  You didn't --

9          MR. ALISON-MAYNE:  So I'm asking about the

10  training and about the factors that officer are taught to

11  take into consideration that go into executing a

12  successful PIT maneuver, as we talked about before, what

13  establishing a full PIT maneuver means.

14         MR. AUSTIN:  Okay.  So by "successful" you mean

15  you "successfully stopped the car."

16         With that understanding, Sergeant Guell, you

17  may answer.

18         THE WITNESS:  Yes.  We go by a step standard

19  with conducting a successful PIT maneuver.

20         It involves three distinct elements:  The

21  officer must first match the speed of the suspect

22  vehicle.  The suspect -- the officer must then make

23  gentle contact with rear quarter panel of the suspect

24  vehicle, with the fender of the police vehicle.

25         And the third step is we instruct the officers

1    to implement, approximately, a quarter turn, or what we

2    also describe as a "lane change amount of steering" into

3    the suspect vehicle, inducing that rotation.

4          And the fourth step is to continue around the

5    rotating suspect vehicle, out of the path of the suspect

6    vehicle, and continue out of the roadway to a safe

7    location.

8          When all those elements are put together, you

9    will have a successful PIT maneuver, and the vehicle will

10   rotate and be stopped.

11   BY MR. ALISON-MAYNE:

12       Q.   And are officers trained to take into

13    consideration the condition of the road?

14          I'll be more specific.

15          Are officers trained to take into consideration

16    whether the road is slippery, for instance, if it's

17    raining or dry, if it's not?

18          MR. AUSTIN:  Objection.  Vague and ambiguous.

19   Incomplete hypothetical.  Calls for speculation.

20          It's unclear what circumstances you're talking

21   about, again.  You still mean for a successful PIT

22   maneuver; right, counsel?

23          MR. ALISON-MAYNE:  Yes.

24          MR. AUSTIN:  Okay.

25          THE WITNESS:  Yes --

1    are going to be able to conduct a successful PIT

2    maneuver, being defined as successful rotation of

3    approximately 180 degrees and the vehicle coming to a

4    stop.

5    BY MR. ALISON-MAYNE:

6        Q.   Given that the goal of a PIT maneuver is to

7     stop the vehicle, as you stated earlier, are officers

8     ever trained that it would be appropriate to do a PIT

9     maneuver on a car that's already stopped?

10           MR. AUSTIN:   Objection.  Vague and ambiguous as

11   to "appropriate."  Calls for speculation.  Lack of

12   foundation.  Incomplete hypothetical.

13           I assume you're still talking about just

14   executing a successful PIT maneuver?

15           MR. ALISON-MAYNE:  I'm talking about PIT

16   maneuver in general, now.

17           MR. AUSTIN:  Okay.

18           MR. ALISON-MAYNE:  I'll try and rephrase the

19   question.

20           MR. AUSTIN:  Okay.

21   BY MR. ALISON-MAYNE:

22       Q.   Are officers trained that it is ever

23    appropriate to do a PIT maneuver on a vehicle that is

24    not moving?

25           MR. AUSTIN:   Objection.  Vague and ambiguous.

1    Incomplete hypothetical.   The policy speaks for itself.

2           You can answer.

3           THE WITNESS:   With -- with regard to that

4    question of whether an officer would be trained to

5    conduct a PIT maneuver on a stopped vehicle, that really

6    wouldn't even come up in our training as -- you know, it

7    seems as a logical -- you cannot PIT nor would you ever

8    need to PIT a stopped vehicle.

9           There's other tactics that would be used for a

10   stopped vehicle, to prevent a pursuit.   But a PIT

11   maneuver would not be the appropriate tool.   That would

12   be like asking somebody, "Would you ever use a piece of

13   bread to nail in a nail?"   It just doesn't make any

14   logical sense.

15   BY MR. ALISON-MAYNE:

16       Q.   Would you agree that the PIT'd vehicle, once it

17    is struck by the officer's vehicle, that the PIT'd

18    vehicle is no longer in control?

19       A.   When the PIT maneuver is conducted, there's a

20    period during the initiation of the PIT maneuver that

21    the suspect vehicle can avoid it by steering away from

22    it, accelerating or braking; therefore, they are still

23    in somewhat control of the vehicle.   Once the vehicle

24    has rotated to approximately 27 degrees of rotation, the

25    forward momentum and the physics in play will take over,

1    and it will create an unrecoverable skid.

2            And at that point, once it's reached that

3    rotation point, it is irrecoverable.  And, no, the

4    driver of the suspect vehicle is no longer in control.

5        Q.   You talked about the training being that -- and

6    the benefit to a PIT maneuver being that it has a

7    predictable outcome, generally, of the car turning about

8    180 degrees and stalling.  Are officers trained that the

9    car, in some circumstances, could spin out -- out of

10   control?  Is that also a possibility?

11           MR. AUSTIN:  Objection.  Vague and ambiguous as

12   to "out of control."  Incomplete hypothetical.  Calls for

13   speculation, and the policy speaks for itself.

14           THE WITNESS:  No.  In a general sense, no.  The

15   vehicle is going to -- the reason that the PIT maneuver

16   is utilized in this sense as an intermediate level of

17   force to end the pursuit is because of the predictable

18   outcomes.  The predictable outcomes come from its wide

19   use.

20           It has been heavily studied, even in an

21   academic sense as to what the outcomes of the vehicle --

22   the maneuver is going to creates.  The vehicle is going

23   to rotate in the fashion that I described, in basically a

24   spinout, if you want to call it.  But is a controlled

25   rotation to approximately 180 degrees within that speed

```
 1    STATE OF CALIFORNIA)
                         ) ss:
 2    COUNTY OF BUTTE    )

 3              I, KIMBERLY E. D'URSO, do hereby certify:
 4
 5              That the witness named in the foregoing

 6    deposition was present remotely and duly sworn to testify

 7    to the truth in the within-entitled action on the day and

 8    date and at the time and place therein specified;

 9              That the testimony of said witness was reported

10    by me in shorthand and was thereafter transcribed through

11    computer-aided transcription;

12              That the foregoing constitutes a full, true and

13    correct transcript of said deposition and of the

14    proceedings which took place;

15              Further, that if the foregoing pertains to the

16    original transcript of a deposition in a federal case,

17    before completion of the proceedings, review of the

18    transcript [ ] was [ ] was not requested.

19              That I am a certified stenographic reporter and

20    a disinterested person to the said action;

21              IN WITNESS WHEREOF, I have hereunder subscribed

22    my hand this 1st day of October, 2025.

23    _____

24    KIMBERLY D'URSO, CSR NO. 11372, RPR

25
```